NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0370n.06
Filed: May 10, 2005

No. 02-2440

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LANA WHEATON,                                       )
    *Plaintiff-Appellee,*                           )
                                                   )   On Appeal from the United
    v.                                             )   States District Court for the
                                                   )   Eastern District of Michigan
NORTH OAKLAND MEDICAL CENTER,                       )
    *Defendant-Appellant*.                          )

_____/

Before: CLAY and GILMAN, Circuit Judges; and O'MALLEY, District Judge.[*]

    *O'MALLEY, J.*  This case is before the Court on appeal from a decision of the United States

District Court for the Eastern District of Michigan, denying in part Appellant's motion for judgment

as a matter of law, new trial, remittitur and/or to alter or amend judgment.  Following a trial, a

verdict was returned in favor of the plaintiff, Lana Wheaton ("Appellee" or "Wheaton"), on her

reverse discrimination action for damages under Title VII, 42 U.S.C. § 2000e, *et seq*.  The

defendant, North Oakland Medical Center ("Appellant" or "North Oakland"), appeals from the

district court's denial of its post-trial motions.

    The following issues are presented in this appeal:

    (1)    Did the district court abuse its discretion when it refused to permit Appellant to
           present the testimony of three defense witnesses who arrived late, and subsequently
           refused to grant a new trial on this basis?

_____

[*]    The Honorable Kathleen O'Malley, United States District Judge for the Northern District
of Ohio, sitting by designation.

(2)     Did the district court err when it permitted evidence at trial of allegedly discriminatory incidents occurring outside the Title VII statute of limitations period to support Wheaton's hostile environment claim, and subsequently refused to grant a new trial on this basis?

(3)     Did the district court err when it denied judgment as a matter of law or a new trial, where Appellant argued that Wheaton's evidence did not demonstrate the type of severe or pervasive racial conduct necessary to a hostile work environment claim, or that the conduct in question was condoned by Appellant?

Also before the Court is a procedural motion – Appellant's motion to supplement the record – which is addressed herein contemporaneously with the substantive appeal.

For the reasons set forth more fully below, North Oakland's motion to supplement the record is **DENIED**. The district's court's ruling is **AFFIRMED** in part, and **REVERSED** in part, and the case is **REMANDED** to the district court for retrial.

## I.     PROCEDURAL BACKGROUND

On October 19, 2000, plaintiff Lana Wheaton filed a complaint against North Oakland alleging (1) reverse-discrimination hostile work environment, and (2) retaliation in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. On October 22, 2001, the district court granted summary judgment to North Oakland on Wheaton's retaliation claim, but denied summary judgment as to the hostile work environment claim.

On May 20, 2002, North Oakland filed a motion in *limine*, requesting that the district court exclude evidence of allegedly harassing incidents occurring more than 300 days before the filing of Wheaton's discrimination charge with the Equal Employment Opportunities Commission ("EEOC"). Wheaton's EEOC charge, filed on September 1, 2000, contained allegations of discriminatory conduct in May 1994 and September 1998, as well as alleged discriminatory acts in the summer of 2000. The district court granted the motion in *limine* as to the 1994 conduct. It denied the motion,

however, as to the 1998 conduct and allowed evidence of the 1998 incidents because the district court deemed those actions relevant to Wheaton's effort to establish a continuing pattern of racial harassment.

The case proceeded to trial on July 9-11, 2002, and the jury rendered a verdict for $1 million in favor of Wheaton. The district court denied, in part, North Oakland's Motion for Judgment as a Matter of Law, New Trial, Remittitur and/or to Alter or Amend Judgment. The district court's written order, entered on October 28, 2002:

(1)     denied the motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b);

(2)     denied the motion for new trial and/or remittitur pursuant to Fed. R. Civ. P. 59(a);

(3)     granted the motion to reduce total damages to $300,000 pursuant to 42 U.S.C. § 1981a's statutory cap; and

(4)     denied North Oakland's separate motion for new trial, which was premised on the court's ruling excluding the testimony of several defense witnesses.

In accordance with its written order, the district court entered judgment for $300,000 in favor of Wheaton. North Oakland appeals the district court's October 28, 2002 order.

## II.     FACTUAL BACKGROUND

Lana Wheaton's employment with North Oakland began in May 1994. During the period relevant to the complaint, Wheaton worked in the Patient Access department, which contained fifteen to seventeen employees. At trial, Wheaton testified to the following facts in support of her hostile work environment claim.

The Patient Access department was staffed largely by black females. Wheaton is a white female who had a long-standing relationship with an African-American male. As a result of that relationship, Wheaton has a biracial daughter.

In June 1998, Wheaton had an altercation with an African-American co-worker, Deirdre Lucas. Apparently, Lucas and Wheaton had a dispute during work hours regarding Wheaton's failure to answer the phone in her area while she was working with a patient. Later, after Lucas's shift had ended, Wheaton was discussing the incident with another co-worker when Lucas came into the work area and confronted Wheaton. Wheaton testified that, during the altercation that ensued, Lucas referred to Wheaton as a "blue-eyed sister wanna-be," and to Wheaton's daughter as a "half-breed." Lucas was not disciplined for this conduct.

Subsequently, on three occasions in August and September 1998, Wheaton found threatening and racially charged notes on her vehicle, which was parked in the assigned employee parking lot. The notes contained several racial epithets and threats – e.g., they referred to Wheaton as a "white ass bitch" or "fucking bitch," and threatened that Wheaton would get her "white ass beat." The notes also referenced Wheaton's boyfriend and stated that Wheaton "had a black man but did not know how to keep him."

Wheaton testified that she reported the second and third notes to her then-supervisor, Twila Setla, but that Setla was skeptical of her complaints. North Oakland took no disciplinary action against any employee as a result of the note incidents, asserting that it could not determine who was responsible for the notes. North Oakland did, however, take steps to prevent Wheaton from receiving additional notes. Wheaton was permitted to park in a different parking lot (i.e., the physicians' lot), which was monitored by a security camera. After Wheaton's parking arrangement was changed, there were no further threatening notes left on her car.

Approximately 20 months after the notes ended, several other incidents occurred. In June 2000, Setla summoned Wheaton to her office. When Wheaton arrived, she found that a co-worker,

Kenyotta Gilmore, was already present. Apparently, Gilmore felt that Wheaton "had a problem" with her and had asked Setla to arrange a meeting between the two employees. Gilmore allegedly confronted Wheaton in Setla's presence. Wheaton testified that she felt ambushed by the unexpected meeting. Wheaton also testified that Gilmore threatened and assaulted her while in Setla's presence. Wheaton claims that Gilmore threatened to beat her "fucking white ass," and stated that she knew where Wheaton lived and where she parked her car. According to Wheaton, Setla had to intervene to prevent a physical confrontation between Wheaton and Gilmore. Gilmore was not disciplined for her conduct.

Also in June 2000, Wheaton found in her desk drawer a printout of an unsolicited and offensive e-mail with the words "To Lana" handwritten on it. The e-mail contained copies of letters which had appeared in a magazine titled "Sister2Sister." The letters were responses to a letter previously written by a white female regarding interracial relationships. The responses reprinted in the e-mail criticized the idea of relationships between black males and white females. The letters also disparaged white females, referring to them as "sexually permissive," "stupid," and "docile." Wheaton testified that, because she is a white female with a black partner and an interracial child, she was very offended by these items. Wheaton examined the address heading on the e-mail and recognized it as belonging to the sister of Dora Geeter, one of Wheaton's co-workers.

After receiving the e-mail, Wheaton turned it over to Setla. Subsequently, North Oakland initiated an investigation into the incident. Delores Burton (Director of Human Resources), Machelle Merriweather (Assistant Director of Human Resources), and Pablo Sanchez (Chief of Security) were assigned to investigate the matter.

On September 29, 2000, North Oakland completed its investigation and produced a written

report, which it shared with Wheaton. The written report indicated that witnesses had been interviewed, and that the committee had concluded that the incident was caused by Wheaton's own confrontational behavior and by personality conflicts within the department. Wheaton was told that she had a role in prompting the harassment since, if she had not disclosed her romantic involvement with an African-American man, it was unlikely co-workers would have given her the e-mail in question. At the same meeting, North Oakland offered Wheaton the option of transferring to one of two other positions, both located in different departments. Wheaton declined both positions, however, since each involved lower pay and less favorable work hours.

Subsequent to its meeting with Wheaton, North Oakland provided general counseling to the entire Patient Access department regarding the North Oakland racial harassment policy, but did not specifically refer to the Wheaton e-mail. No individual employee was ever disciplined for the e-mail incident. Indeed, Geeter testified that, though she had brought the allegedly offensive e-mail to work, as Wheaton had suspected, she was never interviewed, counseled or disciplined regarding the matter.

In addition to the June 2000 incidents, Wheaton testified that she overheard numerous comments at work involving race, interracial relationships and domestic violence. Apparently, co-workers in the Patient Access department were aware that Wheaton had been a victim of domestic violence and commented on this in Wheaton's presence. Wheaton claims that Renee Spears, an African-American co-worker (and later Wheaton's supervisor), referred to her as a "silly white girl" after Wheaton confided to Spears that she had been a victim of domestic violence. Wheaton claims that co-workers also highlighted portions of an internal newsletter pertaining to domestic violence and placed it on her desk. Additionally, co-workers conversed in Wheaton's presence regarding

their opinion that a person must be "stupid" to stay in a relationship after having experienced domestic violence.

After the June 2000 e-mail incident, two more incidents occurred in August 2000, each of which Wheaton characterized as offensive to her. First, someone wrote a disparaging term under Wheaton's name on the office grease board.[1] Second, someone defaced a paper cube purchased by Wheaton's daughter, which was located on Wheaton's desk. The writing on the cube, which had read "#1 Mom," apparently was modified to read "#1 Hoe." Wheaton reported these incidents to Spears, who had become Wheaton's supervisor by then. No disciplinary action was taken, however.

Wheaton testified that, following these incidents, she began to suffer from severe stress and depression. She further testified that, as a result of her symptoms, she was admitted to a "day" hospital for a period of thirty days. Wheaton also apparently suffers from psoriasis, a skin condition, which allegedly worsened considerably in 2000 as a result of stress.

Several other witnesses testified at trial in support of Wheaton's contentions. A former co-worker, Lola Moncrief, testified that she also had a black husband and was poorly treated during her tenure at North Oakland, both by co-workers and by Setla, who failed to respond to Moncrief's complaints of disparaging comments about her marriage.

Susan Pagan, a current North Oakland employee and former co-worker of Wheaton, testified

---

[1]    The grease board apparently contained the names of all of the employees in the department and was used to indicate which employees had performed certain tasks outside of their regular duties on a particular day. When Wheaton came into the department on a Monday morning, she saw that the number "304" had been written under her name, followed by the word "hoe." "Hoe" is a slang term used to mean "whore." The number "304" apparently was intended to have the same meaning. Wheaton testified that if those numbers were placed into a pager or cell phone and viewed upside down, the numbers appeared to spell the word "hoe."

that she had witnessed the altercation between Lucas and Wheaton, and that it was Pagan's opinion that Lucas had instigated the conflict.

The jury returned a verdict for $1 million in favor of Wheaton, which the district court subsequently reduced to $300,000, per Title VII's statutorily imposed damages cap. North Oakland's present appeal followed.

## III.  DISCUSSION

After filing its appeal, North Oakland filed with the district court a motion to supplement the record, which the district court denied. North Oakland then filed a motion to supplement the record with this Court. We first address North Oakland's motion to supplement the record and, thereafter, address the substance of North Oakland's appeal.

### A.      North Oakland's Motion To Supplement The Record Is Denied.

North Oakland's motion to supplement the record was filed after the district court's denial, on April 4, 2003, of a similar motion before that court. In sum, North Oakland seeks to supplement the record to include an offer of proof regarding the proposed testimony and evidence of Twila Setla, Renee Spears and Rose Granberry, all of whom were precluded from testifying during the trial.[2] It is undisputed that, although North Oakland sought to call these witnesses and opposed their exclusion, no offer of proof regarding the excluded testimony was made at trial.

In its motion, North Oakland urges the Court to consider a six-page affidavit of trial counsel Dallas Moon, attached to the motion as Exhibit A, which contains the proposed offers of proof as

---

[2]     A detailed analysis of the district court's refusal to permit the testimony of these witnesses is set forth *infra* in this memorandum, Section III-B.

sub-exhibits 1 through 5.[3] North Oakland cites Fed. R. App. P. 10(e), which provides that "if anything material to either party is omitted from the record by error or accident or is misstated therein, . . . the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected. . . ." Fed. R. App. P. 10(e).

As North Oakland concedes, an appellate court generally is not free to consider evidence that was not contained in the record below. Rule 10(e) allows supplementation of the record in two instances: "(1) when the parties dispute whether the record actually discloses what occurred in the District Court and (2) when a material matter is omitted by error or accident." *United States v. Barrow*, 118 F.3d 482, 487 (6th Cir. 1997). This Court has "not allowed the rule to be used to add new evidence that substantially alters the record." *Id.* at 487-88; *see also Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1012 (6th Cir. 2003) (denying appellant's motion to supplement the record with documents not presented to the district court because it was an improper attempt to introduce new evidence in the court of appeals); *Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003) (unpublished) ("[T]he purpose of amendment under this rule is to ensure that the appellate record accurately reflects the record before the District Court, *not* to provide this Court with new evidence . . . even if the new evidence is substantial.") (emphasis added).

There is no indication that either instance set forth in *Barrow* has occurred in this case. The record fully disclosed what transpired in the district court when it refused to let the three tardy witnesses testify. Although "material matter" was excluded from the record, that did not occur by

---

[3]     This opinion refers to these sub-exhibits as A-1 through A-5.

"error or accident."[4]  Instead, the district court affirmatively denied North Oakland's request to put the three defense witnesses on the stand.  North Oakland, therefore, has not met this Circuit's requirement under Rule 10(e).  To the contrary, North Oakland's request to introduce affidavits about what the witnesses *would have said* is precisely what this Circuit forbids – i.e., the introduction of new evidence that substantially alters the record.  *Barrow*, 118 F.3d at 487; *see also United States v. Page*, 661 F.2d 1080, 1082 (5th Cir. 1981) (observing that trying to "supply what might have been done but was not, [is] beyond the reach of the rule").[5]

Though North Oakland cannot resort to Rule 10(e) to supplement the appellate record, it is apparent that the testimony about which it is concerned is already in the record.  Exhibits A-1, A-2 and A-3 to the motion to supplement are contained in the record at Apx. 352-356 as exhibits to North Oakland's motion for summary judgment.  Similarly, also as exhibits to North Oakland's motion for summary judgment, Exhibits A-4 and A-5 to the motion to supplement appear at Apx. 361-364.  Because Rule 10(a) provides that the "original papers and exhibits filed in the district court" – e.g., exhibits to a motion for summary judgment – constitute the record on appeal, the evidentiary items at issue here are already properly before the Court.

Thus, notwithstanding the Court's conclusion that Rule 10(e) is inapplicable, North Oakland is not actually prejudiced by a denial of its motion to supplement the record.  North Oakland's motion to supplement the record is therefore **DENIED**.

---

[4]     As discussed *infra*, the excluded information actually appears in the record in any event.

[5]     The cases cited by North Oakland for the proposition that a court of appeals may exercise its equitable powers "in the interests of justice" to supplement the record are considered "a minority view," which this Court has not embraced.  *Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 370 (6th Cir. 1998) (unpublished).

**B.     The District Court's Refusal To Permit The Testimony By North Oakland's Tardy Witnesses Was Inappropriate.**

The first issue raised by North Oakland is the district court's exclusion of testimony by three defense witnesses because the witnesses failed to appear in a timely manner.  North Oakland argues that, since it had no record before the district court of being dilatory or noncompliant with the court's directives, the exclusion of this testimony was an unduly harsh sanction.  North Oakland contends that this error alone warrants the granting of a new trial.  Wheaton counters that the sanction was appropriate, given the defense witnesses' extreme tardiness and the court's prior admonitions.  For the following reasons we find that the district court abused its discretion when it excluded the testimony of these three witnesses.

This case proceeded to trial on July 9-11, 2002.  On July 10, 2002, the district court advised all parties and witnesses to be present throughout the following day's proceedings:

> THE COURT: What I would like to do is meet with counsel at 8:45 in the morning to finalize the instructions.  We will go all day.  I think you should have all witnesses here.  It is likely that we will finish before the end of tomorrow.

Trial Transcript of July 10, 2002, Apx. 718.

The trial proceeded as scheduled on the morning of July 11.  At approximately 11:35 a.m. on that day, defense counsel requested an early adjournment for lunch, apparently because its three remaining witnesses had not yet arrived.  The court denied the request for an adjournment, however, and indicated that it would give the witnesses until 11:45 a.m. to appear.[6]  The court then took a ten-

---

[6]     THE COURT: It is 11:35.  I will give them until 11:45.  If they are not here, then that's that.  The case is going.  I told you to have everybody here in the morning, and we'll break for 10 minutes.  At 11:45, they are here or you rest.  *See* Trial Transcript of July 11,

minute recess. After the court returned from recess, it proceeded to discuss jury instructions with counsel and then determined that the three defense witnesses still had not arrived. Defense counsel renewed the request for an early lunch, but the court denied its request. The colloquy between the court and defense counsel was as follows:

> MR. MOON: As I indicated to the Court earlier, I was advised by my client that the three witnesses, Renee Spears, Rose Granberry and Twila Setla were intransient [sic, probably should be *in transit*]. I understand that the Court indicated yesterday that all witnesses in the morning were to be present, but if I also might mention, the Court to recognize there is construction out there, and some people are having a difficult time getting to the court if they have never been here.
>
> I would again ask for an early lunch.
>
> THE COURT: I informed the parties that the trial would be continuing, and as well as the jury, and it is now three minutes to 12. The Court adjourned to allow additional time for them to get here at 11:30, and so I informed the defendant that the parties should be here, we would be going, and this is necessary to run the court, and so we are going to bring in the jury, and if they are not here, you can rest, and then I'll ask plaintiff if there's any further response, and if not, we will proceed to oral argument and begin at 1:00 with the final arguments.
>
> Please bring in the jury.

Trial Transcript of July 11, 2002, Apx. 808-09.

Since North Oakland had no more witnesses present, it rested at 12:00 p.m. and the court released the jury for lunch. When the court reconvened without the jury at 1:08 p.m., all three

---

2002, Apx. 805.

defense witnesses – Twila Setla, Renee Spears and Rose Granberry – were present in the courtroom. North Oakland moved to reopen its case in order to present the testimony of these three witnesses. The court denied North Oakland's request:

> MR. MOON: Just as a preliminary matter, your Honor, I would indicate to the Court that my witnesses are present. I move to open the defendant's proofs to give the testimony from three of the witnesses that I indicated would testify earlier.
>
> THE COURT: I ruled before that they had to be here when your time was there to present witnesses. I waited more than a half hour. They were not here by noon. I told you to have the witnesses here this morning. You had your director of human relations and director of security. By 9:30 or 10, if they were not here and suppose [sic] to be here, you should have had them made [sic] arrangements to have them brought here.
>
> In the meantime, I gave you the extra half hour. You rested, plaintiff rested for rebuttal, and we will begin closing arguments.
>
> Please bring in the jury.

Trial Transcript of July 11, 2002, Apx. 810-11. Accordingly, the testimony of these three defense witnesses was not presented to the jury in North Oakland's case in chief, and the court proceeded to hear closing arguments on the afternoon of July 11, 2002. The jury returned its verdict the same day.

North Oakland argues that the district court's warning to the parties on July 10, 2002 regarding timeliness was vague, since the court never admonished defense counsel that all witnesses should be present before noon, or that tardiness would cause witness exclusion. Additionally, North Oakland relies on road construction in the area as an explanation for the witnesses' late arrival.

North Oakland notes that even the district court cited traffic problems as a reason for releasing the jury early on July 10, 2002.[7]

North Oakland argues, moreover, that the excluded witnesses were important to its case. North Oakland argues:

(1)     Setla would have testified as to her response to, and investigation of, Wheaton's harassment complaints;

(2)     Spears also would have testified about her involvement in the investigation of Wheaton's complaints, as well as Wheaton's relationship with Lucas; and

(3)     Granberry would testify regarding the allegedly offensive e-mail, the "304"/"hoe" incident, and the work environment in the Patient Access department.

Finally, North Oakland argues that rigid adherence to trial schedules and inflexible limits on presentation of evidence are disfavored. *See Amarel v. Connell*, 102 F.3d 1494, 1513 (9th Cir. 1996) (rigid hour limits on trials are disfavored); *Johnson v. Ashby*, 808 F.2d 676, 678 (8th Cir. 1987) (limits on presentation of evidence should be "sufficiently flexible to accommodate adjustment if it appears during trial that the court's initial assessment was too restrictive. . . .") (quotation marks omitted). North Oakland contends that any other rule would infringe on its rights to due process and a jury trial under the United States Constitution.

In response, Wheaton relies on the district court's daily reminders to the parties and the jury as to the importance of timeliness, as well as the extreme lateness of the defense witnesses, in support of the argument that the district court's exclusion of the witnesses was proper. Wheaton

---

[7]     THE COURT: We will break. It is 4:30. We will reconvene at 9:00 in the morning. I think with a lot of the freeways torn up and stuff going on downtown, we will stop at 3:00 tomorrow.

Trial Transcript of June 9, 2002, Apx. 634-35.

notes that, although the witnesses were not present as scheduled at 9:00 a.m., defense counsel waited more than two hours to bring the matter to the court's attention. In fact, during a recess at 10:45 a.m. on July 11, defense counsel announced that he planned to call Setla, Spears and Granberry after the break.[8] At that time, defense counsel neither notified the court that these witnesses had not arrived, nor, apparently, took the necessary steps to secure the witnesses' arrival. Rather, defense counsel waited until 11:35 a.m., when he ran out of witnesses, to inform the court that three defense witnesses had not yet arrived.

Wheaton also relies on the colloquy between defense counsel and the court just before 12:00 p.m. on July 11, 2002, in which counsel acknowledged the court's prior instruction to have all witnesses present in the morning. According to Wheaton, the trial court based its decision to exclude the witnesses on its conclusion that defense counsel had not been diligent in ascertaining the whereabouts of the witnesses on the morning of July 11, 2002. Essentially, Wheaton argues that the district court acted properly and reasonably in attempting to accommodate North Oakland while considering the interests of the jury. Wheaton further argues that the proffered testimony would have been cumulative or counterproductive because North Oakland had already offered several witnesses in an effort to discredit Wheaton. Had the excluded witnesses been permitted to testify,

---

[8]

| THE COURT: | How many witnesses do you expect to call? |
| --- | --- |
| MR. MOON: | I expect to call– |
| THE COURT: | Sanchez? |
| MR. MOON: | Sanchez, Twila Setla, Renee Spears and Rose Granberry. |

Trial Transcript of July 11, 2002, Apx. 779.

Wheaton asserts that she would have presented extensive impeachment evidence on cross-examination, in any event.

Rule 61 of the Federal Rules of Civil Procedure states:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed. R. Civ. P. 61.

Although Fed. R. Civ. P. 61, on its face, applies only to trial courts, the parties apparently agree that, in reviewing the district court's decision to exclude witness testimony, this Court should not set aside the district court's discretionary order unless the error was so egregious as to be inconsistent with substantial justice or to substantially affect North Oakland's rights. *See McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 554 (1984) ("[w]hile in a narrow sense Rule 61 applies only to the district courts . . . it is well settled that the appellate courts should act in accordance with the salutary policy embodied in Rule 61. . . .").[9]  Additionally, a refusal to grant a

---

[9]  28 U.S.C. § 2111, the harmless error statute, articulates the same policy:

> On the hearing of any appeal or *writ of certiorari* in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

28 U.S.C. § 2111.

new trial based on issues of evidence admission is subject to review for abuse of discretion. *See*

*Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989). The magnitude of the error

committed, moreover, may be assessed solely by an examination of the facts of the particular case.

*See Peterson v. Calmar S.S. Corp.*, 296 F. Supp. 8, 11 (E.D. Pa. 1969) ("the harm which has resulted

from any particular error can be assessed properly only by an examination of the facts of the

individual case. . . ."). This Court thus reviews the district court's discretionary exclusion of

witnesses and denial of a new trial in accordance with this standard.

Although the parties have cited no federal case law involving the exclusion of testimony

based on the witness's tardiness, we have found some, albeit sparse, authority on the issue. In

*United States v. Wilson*, 27 F.3d 1126, 1127 (6th Cir. 1994), a criminal appeal decided by this Court,

the defendant requested a continuance on the final morning of trial because he anticipated the arrival

of two tardy witnesses. In that case, the district court granted a thirty-minute continuance and then

commenced closing arguments. When one of the defense witnesses arrived during closing

arguments, the trial court refused to halt closing arguments in order to allow the tardy witness to

testify.

This Court held that the trial court in *Wilson* had not abused its discretion by not allowing

the defendant the opportunity to call two of his witnesses on his behalf. The Court noted that the

conduct of a trial is a matter of trial court discretion and stated that, in considering whether to allow

a party to present late evidence, "[t]he district court judge must consider the party's explanation for

failing to introduce the evidence earlier, the admissibility of the evidence, its relevance, and the

degree to which the opposing party would be prejudiced by reopening the case." *See id.* at 1129,

citing *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985). The Court noted that defense counsel had been admonished that trial would begin at 9:00 a.m., and defense counsel had failed to have the witnesses present at that time. Moreover, the district court granted a thirty-minute continuance before allowing closing arguments to commence. This Court found that it was not unreasonable for the trial court to refuse to halt final arguments after they had commenced, or to refuse to allow testimony of an additional witness after closing arguments, and that the court had the discretion to conclude in such circumstances that a reopening of defendant's case might confuse the jury or provide defendant with an unfair advantage. *See id.*

Similarly, in *United States v. Brannon*, 546 F.2d 1242, 1245 (5th Cir. 1977), the Fifth Circuit held that it was not error to refuse to grant a continuance to allow for the late arrival of an impeachment witness, because "diligence ha[d] not been exercised to compel [the witness's] attendance [and] there [was] no adequate showing that substantial favorable evidence would be tendered." *Id*. (quotation marks omitted). In that case, no attempt had been made to subpoena the witness, and no explanation was given as to why the defense could not have produced the witness within the preceding twenty-four hours. Moreover, since the witness would have testified only to a collateral matter, the Court did not believe that the failure to allow a continuance for the witness's testimony prejudiced the defense. *See id.*

The facts here are distinguishable from those in *Wilson* and *Brannon*. First, although North Oakland was informed that trial would commence at 9:00 a.m., it did not fail to have any witnesses present to testify on the morning of July 11, 2002. Rather, it appears that North Oakland anticipated that it would call these witnesses later in the morning, and that North Oakland was informed at some point in the morning that its last three witnesses had been delayed. North Oakland informed the

court, on the record, that it had subpoenaed the witnesses and had reason to believe they were on their way to the courthouse.

Additionally, unlike *Brannon*, there is no reason to believe that the testimony of these three individuals would have been irrelevant or inconsequential to North Oakland's case. Setla, Spears and Granberry all were, at some point, in supervisory positions with respect to Wheaton, and all were involved in the investigations of the alleged harassment. These individuals likely had information regarding the thoroughness of those investigations and any action that was taken by North Oakland to correct or prevent the alleged harassment. In fact, these were presumably the primary witnesses who could have rebutted Wheaton's contention that the supervisors at North Oakland permitted or tolerated continuing harassment towards her. It cannot be said, therefore, that the testimony of these witnesses was cumulative, inconsequential or merely "collateral."

Finally, unlike *Wilson*, the district court was in a position to reopen the case before closing arguments had commenced. The district court released the jury only a short time after the last available witness had testified, just before noon. When the jury returned an hour later, all three witnesses were present in the courtroom and could have been called before arguments began. There was, accordingly, no risk of prejudice to Wheaton, no chance of jury confusion and very little inconvenience to the jury had the case been reopened.

We are not unsympathetic to the district court's desire to keep the trial moving and avoid wasting jurors' time. We are also mindful that it is frustrating when parties do not seem to share the Court's concern with maintaining an efficient and predictable trial schedule. And, we know that our review of the trial court's calls in this area must be an extremely deferential one. Despite these realities, however, we are compelled to conclude that, in the circumstances of this case, the district

court erred when it refused to allow North Oakland to reopen its case to present the testimony of these three clearly relevant (even if tardy) witnesses.

Accordingly, the district court's denial of a new trial based on its refusal to allow the testimony of three defense witnesses must be reversed, and the case remanded for a new trial. This conclusion arguably relieves us of any obligation to address North Oakland's other asserted grounds for reversal. Because the issues rased by those grounds likely will appear again upon retrial, however, we will consider them.

**C.      The District Court's Denial Of North Oakland's Motion *In Limine* With Respect To The 1998 Incidents Was Appropriate.**

North Oakland's second contention is that the district court erred in denying its motion *in limine* to exclude evidence of alleged incidents of harassment occurring outside the 300-day statute of limitations, and by refusing to grant a new trial based on the denial of that motion.

Pursuant to Title VII, a plaintiff must file a timely charge with the EEOC prior to filing a discrimination suit in federal court. *See Rivers v. Barberton Bd. of Educ.*, 143 F.3d 1029, 1032 (6th Cir. 1998) (receipt of right-to-sue letter is a condition precedent to suit in federal court). Generally, the time for filing an EEOC charge is "triggered at the time the alleged discriminatory act occurred." *See Dixon v. Anderson*, 928 F.2d 212, 216 (6th Cir. 1991). Thus, a plaintiff generally may not recover for any employment discrimination that occurred more than 300 days before the filing of an EEOC charge. *See EEOC v. Ford Motor Credit Co.*, 26 F.3d 44, 46 (6th Cir. 1994) ("[A]n aggrieved employee must normally bring a charge within 300 days of the injury; put another way, normally no plaintiff can recover for any employment discrimination that happened more than 300 days before she brings a charge. . . ."). *See also* 42 U.S.C. § 2000e-5(e)(1).

The district court granted North Oakland's motion *in limine* with respect to alleged incidents

of harassment occurring in 1994; thus, evidence of the 1998 incidents was the only evidence of conduct outside the statutory period which was presented to the jury. The district court linked the 1998 incidents to alleged incidents of harassment in 2000 and admitted evidence of these incidents in support of Wheaton's "continuing violation" theory.

Since it is undisputed that Wheaton did not file any discrimination charge with the EEOC prior to September 1, 2000, North Oakland argues that permitting evidence of the 1998 incidents was inherently improper and prejudicial, and that evidence of incidents occurring so far outside the statute of limitations could not be probative of liability for conduct occurring within the statute of limitations. North Oakland further argues that Wheaton failed to establish the existence of a hostile work environment in 1998 and, thus, had proffered nothing meaningful to link the 1998 events to those occurring in 2000.

"If a trial court has improperly admitted evidence and a substantial right of a party has been affected, the trial court may order a new trial. . . ." *See Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989). The parties agree, however, that a refusal to grant a new trial based on the district court's evidentiary rulings is subject to review for abuse of discretion. *See id.*

In this Circuit, an employee may establish a racial hostile work environment claim by proving that "(1) the employee is a member of a protected class; (2) the employee was subject to unwelcomed . . . harassment . . . ; (3) the harassment complained of was based on [race]; (4) the . . . harassment had the effect of unreasonably interfering with the employee's work performance and creating an intimidating, hostile, or offensive work environment . . . ; and (5) *the existence of respondeat superior liability*." *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996) (emphasis in original). Additionally, "where a plaintiff . . . challenges not just one incident of conduct . . . but

an unlawful practice . . . that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice. . . ." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) (applying continuing violation theory in context of Fair Housing Act); *see also Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir. 1992) (applying continuing-violation theory in employment context, where prior incidents were sufficiently related to later discriminatory incident, which occurred within the statutory period).

North Oakland contends that the district court incorrectly determined that the continuing-violation theory applies here, because (1) there was no evidence that the 1998 note incidents were perpetrated by any North Oakland employee; (2) even if one of its employees was responsible for the incidents, North Oakland effected prompt remedial relief; and (3) the 1998 incidents were too infrequent and isolated to constitute "continuing acts." Employers generally are not liable for non-employee conduct outside the workplace, or for employee conduct within the workplace where the employer takes prompt remedial action upon learning of the offensive behavior. *See Gliatta v. Tectum, Inc.*, 211 F. Supp. 2d 992, 1002 (S.D. Ohio 2002) ("Employers are liable for the actions of nonemployees only when they knew or should have known of the offensive behavior and failed to take immediate and appropriate action."). *See also Fleenor*, 81 F.3d at 51 (no liability, because company's remedial action was sufficient to stop harassment).

It is true, moreover, that the "continuing violation" theory applies only (1) "where there is some evidence of *present* discriminatory activity giving rise to a claim of a continuing violation. . . .," *Haithcock*, 958 F.2d at 678 (emphasis in original) (internal quotation marks omitted); and (2) where plaintiff presents evidence of "a long-standing and demonstrable policy of discrimination . . . ." *Dixon*, 928 F.2d at 217. Thus, there must be some connection between past alleged

discriminatory acts and continuing discriminatory conduct in order to invoke the "continuing-violation" theory.

North Oakland contends that its corrective reassignment of Wheaton to the physician's parking lot and the passage of time between 1998 and 2000 were sufficient to sever any causal link between the events of those two time periods. For these reasons, North Oakland claims that the district court erred in failing to exclude all references to the 1998 harassment.

In denying the motion *in limine* to exclude the evidence of the 1998 incidents, the district court relied on the Supreme Court's decision in *AMTRAK v. Morgan*, 536 U.S. 101, 105 (2002). In that case, the Supreme Court held that, in applying the "continuing-violation" theory, a court may consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period . . . ." *Id.* Evidence of earlier incidents is admissible where "the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* at 120. Evidence of "discrete acts of discrimination or retaliation that occur outside the statutory time period," however, is precluded. *Id.* Simply put, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and, if so, whether any act falls within the statutory time period." *Id.* at 120. Based on *AMTRAK*, the district court excluded evidence of alleged harassing incidents from 1994, but admitted evidence of the 1998 incidents as part of an alleged continuing violation.

The district court's interpretation of *AMTRAK* was not an abuse of discretion. Essentially, *AMTRAK* requires a trial court to determine whether purported incidents of harassment occurring outside the statutory period are *sufficiently related* to those incidents occurring within the statutory

period as to form one continuous hostile work environment. This is a very case-specific inquiry that the trial court is best-equipped to make.

In this case, Wheaton presented evidence of various racial incidents between her and several of her co-workers and supervisors, including the incident with Lucas in June 1998, the threatening notes on her vehicle in 1998, the e-mail incidents in June 2000, the altercation with Gilmore in June 2000, and the two specific insulting incidents in August of 2000. In addition, Wheaton presented evidence of ongoing use of racial slurs and epitaphs, which she asserts were at least tolerated by supervisors. Although North Oakland argues that it instituted prompt remedial action with respect to the 1998 incidents, this is true, at best, only with respect to the allegedly threatening notes. There is no evidence in the record, nor has North Oakland argued, that any action was taken against Lucas as a result of her 1998 altercation with Wheaton.[10]

There is some similarity between the 1998 incidents and the 2000 incidents, moreover. Specifically, the Lucas incident and the Gilmore incident both involved racial comments made by a co-worker during a confrontation. Additionally, both the notes left on Wheaton's car in 1998 and the e-mail left in her desk in 2000 referenced the fact that Wheaton was white and had a relationship with a black man. And, it appears that the investigations undertaken for all these incidents were less than diligent and that no employee other than Wheaton herself was ever criticized or disciplined in connection with these events. Thus, on the basis of the record before this Court, the district court

---

[10]     North Oakland seems to contend that its investigation found Wheaton to be the aggressor or that, at the least, both employees were at fault. Wheaton presented evidence at trial, however, that Lucas had instigated the altercation and that North Oakland's investigation was far from adequate. Thus, the jury could have found that it was inappropriate for North Oakland to fail to institute discipline against Lucas.

did not abuse its discretion in determining that these incidents were sufficiently related to form a continuing pattern of harassment based on Wheaton's race, and the race of her significant other.

Accordingly, the district court's denial of North Oakland's motion *in limine* as to the evidence of the 1998 incidents, and the district court's denial of a new trial on this basis, were not erroneous.

> **D.** **The District Court's Denial Of Judgment As A Matter Of Law Based On North Oakland's Insufficiency Of The Evidence Argument Was Appropriate.**

North Oakland's final contention is that the district court erred when it denied North Oakland's motion for judgment as a matter of law, or for a new trial, based on North Oakland's argument that the evidence at trial was insufficient to permit a jury finding of severe or pervasive harassment condoned by North Oakland.

At the close of Wheaton's case, North Oakland moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). In denying that motion, the trial court stated:

> THE COURT: I heard the evidence, and at this point, as you know, I have to take it in the light most favorable to the nonmoving party.
>
> I feel that there is sufficient evidence to go to the jury on the claim of racial harassment, and I also find there is sufficient evidence to allow the jury to consider punitive damages.

Trial Transcript of July 10, 2002, Apx. 685-86. At the close of all evidence, North Oakland did not renew its prior motion for judgment as a matter of law.

Following trial, and the jury's verdict in favor of Wheaton, North Oakland *filed* a renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). That rule provides:

> If, for any reason, the court does not grant a motion for judgment as a matter of law *made at the close of*

*all the evidence*, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment–and may alternatively request a new trial or join a motion for new trial under Rule 59. . . .

Fed. R. Civ. P. 50(b) (emphasis added). Wheaton filed no opposition to North Oakland's post-trial motion. The district court denied North Oakland's motion based on its failure to move for judgment as a matter of law *at the close of all the evidence* and did not address the merits of North Oakland's claim that the evidence was insufficient to support the jury's verdict in favor of Wheaton. *See* Order Granting in Part and Denying in Part Defendant's Post-Trial Motions, Apx. 29. The district court held:

> . . . as expressed in the text of Rule 50(b), a party seeking a judgment non obstante ver[e]dicto (N.O.V.), 'must, as a prerequisite, move for a directed verdict at the close of all the evidence or renew such motion if made prior to the close of all [the] evidence.' *Riverview [Investments], Inc. v. Ottawa Community Improv. Corp.*, 899 F.2d 474, 477 (6th Cir. 1990). . . . Here, Defendant did not move for a directed verdict at the close of all evidence, nor did Defendant renew a motion for judgment as a matter of law made at the close of Plaintiff's proofs. Consequently, a renewed motion for judgment after trial pursuant to Rule 50(b) cannot be maintained by Defendant. As such, the Court DENIES Defendant's "renewed" motion for judgment after trial.

*Id.*

Wheaton initially argues that the district court was correct and that North Oakland's Rule 50(b) post-trial motion was properly denied because it failed to bring a motion for judgment as a matter of law *at the close of all of the evidence*. North Oakland counters that such a motion was not necessary – and certainly is not a procedural prerequisite to this Court's review – because North

Oakland's failure to orally renew its motion at the close of all the evidence was not a fatal error. North Oakland premises its argument on two grounds.

First, North Oakland argues that Wheaton waived this issue by failing to oppose the post-trial motion when it was made. *See Thompson & Wallace, Inc. v. Falconwood Corp.* 100 F.3d 429, 435 (5th Cir. 1996) (failure to raise the lack of a 50(a) motion in the opposition to a 50(b) motion may preclude the appellee from raising that argument on appeal). Second, North Oakland argues that a technical deviation from Fed. R. Civ. P. 50(b) – i.e., the implied requirement that a motion be renewed at the close of all evidence – is not fatal, particularly where, as here, the district court emphatically stated its intention to submit the case to the jury when it denied the Rule 50(a) motion. *See Riverview Invest., Inc. v. Ottawa Community Improv. Corp.*, 899 F.2d 474, 478 (6th Cir. 1990) (renewal of motion not necessary where district court had indicated that such renewal would not be required).

Although the district court did not indicate unambiguously that renewal of the Rule 50(a) motion would not be required in order to preserve the record, it does appear that Wheaton's failure to oppose the post-trial motion waived Wheaton's right to challenge North Oakland's apparent procedural violation. Accordingly, this Court can address the merits of North Oakland's appeal on this issue – i.e., the sufficiency of the evidence – in order to determine whether the district court improperly denied North Oakland's trial and post-trial motions for judgment as a matter of law, and for a new trial.

A trial court's denial of a Rule 50(b) motion is subject to *de novo* review. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000). A denial of a motion for new trial pursuant to Fed. R. Civ. P. 59(a) is reviewed for abuse of discretion. *See Conte v. General Housewares*

*Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). Since the record provides ample evidence to support the jury's verdict, the district court's decision was correct under either standard.

As noted previously, in an action for racial harassment, a plaintiff must show that "(1) [s]he belongs to a protected group; (2) [s]he was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) defendant knew or should have known about the harassment and failed to take action." *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999). A plaintiff also must demonstrate that the harassment created an unreasonably abusive work environment or adversely affected her ability to perform her work. *See Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

First, North Oakland argues that the evidence presented at trial was not sufficient to support a jury finding that the conduct in question was severe or pervasive. In determining whether conduct is severe or pervasive, a court must look to the totality of the circumstances. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotation marks omitted).

Specifically, North Oakland contends that (1) only two of the incidents that occurred in 2000 – the e-mail incident and the Gilmore altercation – were race-related; (2) the investigation undertaken by North Oakland as to those incidents was appropriate; and (3) no evidence was presented to show any recurrence of harassment from Lucas or notes on Wheaton's car after the 1998 incidents. North Oakland argues that this evidence does not approach the level of conduct

required by this Court in hostile work environment cases. *See Moore*, 171 F.3d 1073. *See also Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000) (finding that the jury's verdict for plaintiff was unsupported where plaintiff presented evidence of only isolated comments by non-decision makers).  Rather, North Oakland argues that the conduct complained of by Wheaton here is similar to the insufficient evidence presented in cases such as *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998) (holding that two incidents over a two-year period were insufficient to allow plaintiff's hostile work environment claim to go to the jury); and *Bowman*, 220 F.3d 456, 464 (6th Cir. 2000) (concluding that five incidents in four years did not constitute severe or pervasive conduct).

Second, North Oakland argues that the evidence presented at trial did not show employer condonation, because it demonstrated that North Oakland conducted prompt investigations on Wheaton's complaints and took appropriate action on those complaints, including providing counseling to all personnel in Wheaton's department on its racial-harassment policies.

Finally, North Oakland argues that the evidence presented at trial was insufficient to support the jury's verdict awarding punitive damages against North Oakland.  Pursuant to 42 U.S.C. § 1981a(b)(1), a plaintiff can recover punitive damages in a discrimination case only "if the complaining party demonstrates that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual. . . ." 42 U.S.C. § 1981a(b)(1).  Thus, the imposition of punitive damages is limited to cases where a plaintiff demonstrates "egregious conduct or willfulness, malice or reckless indifference on the part of the defendant . . . ." *Moore*, 171 F.3d at 1083.

With respect to the issues of severe and pervasive conduct, although North Oakland may

disagree as to whether the number and type of incidents described suffices to constitute a hostile work environment, the record provides support for the jury's verdict, and this Court should not lightly disturb that verdict. Even leaving aside the "304/hoe" incidents, which did not involve specific references to Wheaton's race, or the generally intolerant atmosphere described by Wheaton and her witnesses, there were at least four multi-part racial incidents over the two-year period involved here, none of which resulted in any discipline of any co-worker and only one of which resulted in any meaningful change in Wheaton's working environment.

Wheaton received numerous threatening notes and an offensive e-mail addressed to her personally, all of which repeatedly referenced her race and her relationship with a black man. Additionally, there were at least two altercations with African-American co-workers, during which racial epithets were directed to Wheaton. There were, moreover, two episodes involving threats of physical harm – the notes on Wheaton's vehicle, and the Gilmore episode. And, the Gilmore episode occurred in the presence of a supervisor.

Finally, if the jury believed Wheaton's testimony, as it was free to do, evidence also was presented of comments made in Wheaton's presence regarding domestic violence and the alleged reference by Spears (Wheaton's subsequent supervisor) to Wheaton as a "silly white girl." In light of that evidence, there is sufficient support for the jury's verdict that a hostile work environment existed at North Oakland.

With regard to the issue of North Oakland's knowledge or condonation of this work environment, moreover, the record is also adequate to support Wheaton's contentions. Although North Oakland had a non-discrimination policy and initiated investigations into Wheaton's complaints, the evidence was conflicting as to the scope and result of these investigations. There

is no dispute that no employee discipline occurred as a result of any of the allegedly discriminatory incidents. With respect to the vehicle-note incidents and the e-mail incident, while certain North Oakland employees testified that they could not determine who was responsible for those incidents, Pablo Sanchez testified that he did not interview Dora Geeter regarding the e-mail incident, even though Geeter admitted that she had brought the offending e-mail to work and the face of the e-mail itself referenced Geeter by name. Sanchez apparently did counsel the entire Patient Access department regarding the company's non-discrimination policy, but no individual counseling or discipline took place.

Rather, Wheaton testified that 1) she was reprimanded regarding the e-mail incident and told that it was caused by her personality conflicts with other co-workers, and 2) was offered a "transfer" which would have been, in essence, a demotion. Based on this evidence, a reasonable jury could have found that North Oakland's response to the discrimination complaints was so inadequate as to constitute condonation or toleration of discriminatory conduct. Accordingly, we conclude that the district court's denial of North Oakland's motion for judgment as a matter of law, and motion for a new trial, on this issue was not error.

With respect to punitive damages, the jury's $1 million verdict awarded Wheaton $325,000 in compensatory damages, and $675,000 in punitive damages. In the district court's October 28, 2002 Order, however, the district court determined that Wheaton's claim was subject to the statutory damages cap set forth in 42 U.S.C. § 1981a(b)(3)(D), which provides:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed,

for each complaining party –

\*\*\*

(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

42 U.S.C. § 1981a(b)(3). Accordingly, the total award was reduced to $300,000. In its Order, the court stated that ". . . the jury award of $325,000 in compensatory damages and $675,000 in punitive damages is hereby reduced to a total damage award of $300,000 pursuant to § 1981a(b)(3)(D)." *See* Order Granting in Part and Denying in Part Defendant's Post-Trial Motions, Apx. 28.

North Oakland argues that there is insufficient evidence in the record to support a finding of "willfulness" necessary to support a punitive damage award. North Oakland's argument is necessarily premised, however, on the assumption that the $300,000 reduced award still includes a punitive component. We disagree with that assumption.

We find, instead, that it is more reasonable to assume that the district court's judgment meant, to the extent permitted by the law, to give effect to the jury's compensatory damage award, and, of necessity, eliminated any award of punitive damages. Where, as here, the compensatory damage award exceeds the statutory cap and there is no argument or evidence drawing into question the reasonableness of that award, we will not assume that the district court meant to reduce the compensatory damages component of the judgment before it absent a clear statement of such an intention. Where there is no punitive damages award on the record before us, we decline to opine on the propriety of such an award.

IV.    **CONCLUSION**

For the foregoing reasons, North Oakland's motion to supplement the record is **DENIED**. The district court's denial of North Oakland's motion for a new trial *based on the exclusion of testimony of defense witnesses Setla, Spears and Granberry* is **REVERSED**, and the case is **REMANDED** for a new trial on that basis. The district court's denial of North Oakland's motion for judgment as a matter of law on the grounds that the court erred in admitting evidence of 1998 instances of alleged harassment and the sufficiency of the evidence to support a liability verdict in favor of Wheaton is **AFFIRMED**.